709 So.2d 873 (1998)
Vita Jean KAHLDEN, Plaintiff-Appellee,
v.
HORSESHOE ENTERTAINMENT, Defendant-Appellant.
No. 30277-WCA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 1998.
*874 Degan, Blanchard & Nash by John E. Faherty, Jr., New Orleans, for Appellant.
Klotz & Simmons by David Klotz, Shreveport, for Appellee.
Before NORRIS, STEWART and CARAWAY, JJ.
CARAWAY, Judge.
This is a worker's compensation matter arising out of an injury sustained by the claimant, Vita Kahlden, while on her job as a blackjack dealer at the Horseshoe Casino. Horseshoe terminated payments of worker's compensation benefits when, it alleges, Kahlden turned down offers to return to work in a modified position that would accommodate her in her diminished capacity. After trial, the worker's compensation judge (WCJ) awarded the claimant supplemental earnings benefits (SEBs) and cast Horseshoe in judgment for penalties and attorney fees. Horseshoe appeals contesting plaintiff's continuing disability and the amount of SEB's awarded. Claimant answers the appeal and requests additional attorney fees. Finding no manifest error, we affirm for the most part the WCJ's rulings, amending only with regard to the calculation for the award for SEBs.

Facts
Vita Kahlden was employed as a blackjack dealer at the Horseshoe Casino in Bossier City. Blackjack dealers at Horseshoe work for one-hour periods standing at the blackjack table conducting the games, followed by twenty-minute breaks before returning to the table for the next hour. On August 4, 1995, plaintiff was on a twenty-minute break from dealing and was in the restroom when the accident occurred. As Kahlden unlatched the stall door to exit, the heavy door fell from its hinges and crushed her left big toe. Kahlden was 58 years old at the time.
Horseshoe sent Kahlden to Dr. Haynie, an orthopaedic surgeon. When she did not improve after several weeks, Dr. Haynie sent her to his partner, Dr. Lillach, who specializes in ankle and foot problems. Dr. Lillach eventually released the claimant to return to work. On September 27, 1995, Kahlden returned to work one 4 hour day as a blackjack dealer allegedly under the threat of losing her job, but had to be relieved because her foot hurt and she could not return.
On October 25, 1995, Horseshoe gave Kahlden a temporary, semi-sedentary, clerical job for which she was paid $4.43 per hour, the same base pay as a blackjack dealer. As will be seen below, however, a blackjack dealer earns considerably more money in "tokes" than in the base hourly wage. Nevertheless, from October 25 until the end of December, while Kahlden worked at this job, no SEBs were paid by Horseshoe.
During this time, Kahlden also began to see her own doctor, Dr. Wade Fox, for the continuing problem with her foot. Dr. Fox, had treated plaintiff in 1991 for injuries sustained in an automobile accident. Dr. Fox testified that when he first treated Kahlden for her foot injury, she could do only sedentary work. Horseshoe produced evidence that it offered her a sedentary job at $7.00 *875 per hour in late December, 1995, but the claimant turned it down because it required weekend work. Claimant admits that the job was discussed with her, but she claims she was never called to work.
Later, in 1996, Horseshoe decided to get another medical opinion and sent the claimant to Dr. Mead, who was hired from time to time by Horseshoe to give primary or secondary opinions in worker's compensation matters. Dr. Mead concluded after his December 4, 1996 examination that the claimant was faking her injury based upon his observation of her walking into the examination room.
Despite Dr. Mead's evaluation of Kahlden, Dr. Fox held to the view that the claimant could return to her job as a blackjack dealer only if she were allowed to sit on a stool or not stand more than 30 minutes without a break. Horseshoe claims that on February 20, 1997, it offered Kahlden a position with such accommodations. However, there was no evidence in the record demonstrating that Horseshoe actually offered the claimant the job with the accommodations required by Dr. Fox. Horseshoe's letter to Kahlden's attorney made no reference to such accommodations.
Horseshoe does not contest the accident or the medicals, which it has paid. Because it was 35 days late in making the first compensation payment, it stipulated to $1750 in statutory penalties in that regard. Horseshoe disputed plaintiff's entitlement to SEBs claiming that it offered her jobs that would accommodate her inability to stand continuously for one hour at a time at the blackjack table.
The WCJ found in favor of the claimant holding that her injury prevented her from performing her previous job as a blackjack dealer as a result of the job injury. The claimant was awarded SEBs commencing on October 25, 1995, for 10 weeks at a rate of $189.61 per week and thereafter at a rate of $307.33 per week, based on two-thirds of an average weekly wage determined to be $461.60. The judgment also awarded the claimant $3750 in penalties, $1750 of which was the stipulated amount for late compensation payment and $2000 for failure to pay SEBs after October 25, 1995. The judgment awarded the claimant $7500 in attorney fees.
Horseshoe appeals complaining that the trial court manifestly erred in awarding SEBs at a rate of $307.33 per week after December 31, 1995, claiming that a $7.00 per hour job offer was presented to the claimant around December 31, 1995. It further argues that the SEBs should terminate on February 20, 1997 because it claims it proved that it offered the claimant her job as a blackjack dealer at her previous pay on that date. Finally, Horseshoe complains about the court's calculation of SEBs.

Discussion

Supplemental Earnings Benefits
An employee is entitled to receive SEBs if he sustains a work-related injury that results in an inability to earn ninety percent (90%) or more of his average pre-injury wage. La. R.S. 23:1221(3)(a). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Freeman v. Poulan/Weed Eater, 93-1530, (La.1/14/94), 630 So.2d 733 at 739. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that worker's compensation is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989). Seal v. Gaylord Container Corporation, 97-C-0688 (La.12/2/97), 704 So.2d 1161. The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident. Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52, 55 (La.1993).
Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic *876 region. La. R.S. 23:1221(3)(c)(i); Daigle, 545 So.2d at 1009. Actual job placement is not required. Romero v. Grey Wolf Drilling Co., 594 So.2d 1008 (La.App. 3d Cir.1992). The amount of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. La. R.S. 23:1221(3)(a); Banks v. Industrial Roofing & Sheet Metal Works, Inc., (La.1997) 696 So.2d 551.
Factual findings in a worker's compensation case are subject to the manifest error or clearly wrong standard of appellate review. Smith v. Louisiana Dep't of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Freeman v. Poulan/Weed Eater, 93-1530 (La.1/14/94), 630 So.2d 733, 737-38. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Freeman, 93-1530, 630 So.2d at 737-38; Stobart v. State, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
From our review of the medical testimony, the WCJ was not manifestly wrong in her choice of Dr. Fox's view of Kahlden's continuing condition over the views of Dr. Lillach and Dr. Mead. Kahlden's ability to continue to work as a blackjack dealer has been prevented by the injury, and this has resulted in her inability to earn ninety percent of her pre-injury wage.
We further conclude that the WCJ was presented with two permissible views concerning the issue of job availability. Upon reviewing the record, we find no manifest error in the worker's compensation tribunal's factual conclusions that there were no viable job offers from Horseshoe on the table on December 31, 1995 or February 20, 1997. Horseshoe did not demonstrate, therefore, that it had provided rehabilitation services to Kahlden by accommodating her return to a modified position. La. R.S. 23:1226 B.
Furthermore, defendant presented no evidence regarding job availability for the claimant in endeavors other than that of blackjack dealer. Again, once the plaintiff has shown that she is entitled to SEBs, it is the defendant's burden to come forward and show that the employee is physically able to perform a certain job and that a job was offered to the employee or that a job was available to the employee in either the community or the reasonable geographic region. La. R.S. 23:1221(3)(c)(i).

Calculation of Average Weekly Wage
The calculation for SEBs under La. R.S. 23:1221 is based upon two-thirds of the difference between the employee's average monthly wages at the time of injury and what he is able to earn thereafter. The average monthly wages are defined as "four and three-tenths times the wages defined in La. R.S. 23:1021(10)." Wages are defined in R.S. 23:1021(10), in pertinent part, as:
(10) "Wages" means average weekly wage at the time of the accident.
The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or
(ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident; or
* * * * * *

*877 (b) Monthly wages. If the employee is paid on a monthly basis, his monthly salary multiplied by twelve then divided by fiftytwo.
(c) Annual wages. If the employee is employed at an annual salary, his annual salary divided by fifty-two.
(d) Other wages. If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by four....

Horseshoe contends that the WCJ's choice of La. R.S. 23:1021(a)(i) for the method of calculation in this case was improper since the evidence shows that Kahlden was not employed on the basis of a work week of forty hours or more. The WCJ based her calculation upon the claimant's last two paycheck stubs or four-week period using a mathematical calculation whereby the claimant's gross pay, $1569.45, was divided by the total hours worked for the two pay periods, 136 hours, yielding an hourly rate of $11.54. The hearing officer then multiplied this hourly rate by 40 hours, as indicated under La. R.S. 23: 1021(10)(a)(i), supra, to obtain an average weekly wage of $461.60, even though, as argued by Horseshoe, the claimant averaged less than forty hours per week the last four weeks as well as most of the previous year.
Contrary to the WCJ's method of calculation, Horseshoe asserts a method for calculation in line with the method expressed in La. R.S. 23:1021(10)(a)(ii). Using that method for calculation, the $1569.25 Kahlden earned in her last four weeks divided by four indicates a $393.36 average weekly wage.
From our review of the wage information in the record, which includes Kahlden's earnings for the entire year prior to the accident, we note two significant facts. First, the majority of Kahlden's earnings came from tokes and not her $4.43 base hourly wage. The tokes or tips, reported on Kahlden's paycheck stubs, were apparently collected by Horseshoe and paid to Kahlden in each of her biweekly paychecks. Second, Kahlden consistently averaged less than a forty hour work week. From these facts, the calculation methods represented by La. R.S. 1021(10)(a)(i) and (ii) for employees with predominantly fixed hourly wage rates or stable hourly work weeks do not apply to Kahlden.
The tokes or tips which Kahlden earned represent a variable wage factor dependent on the level of business activity. As such, the average wage for a gaming employee earning tokes or tips is best calculated under La. R.S. 23:1021(10)(d), in the same manner that employees on commission are treated under the Act. See, Dupont v. Holiday Inn of Jennings, 96-684 (La.App. 3d Cir. 12/11/96), 685 So.2d 525. The variable nature of both Kahlden's wages from tokes and her hours worked per pay period best places her under Section 1021(10)(d) with its consideration of a twenty-six week work period, as opposed to the shortened four-week wage average used under Section 1021(10)(a). The longer period averages out these variances and allows consideration for seasonal swings in Horseshoe's level of business.
Using Section 1021(10)(d)'s method for calculation, Kahlden's wage reports for the twenty-six week period preceding the accident show that she earned $11,770.49 ($7701.68 in tokes and $4068.81 in wages). She worked a total of 870.25 hours during this period. Although the wage information does not reveal the total number of days worked, Kahlden testified at trial that she usually worked an eight-hour shift. Therefore, we have calculated the number of days worked for this period as 109 days (870.25 divided by 8). From this data, Kahlden earned an average of $107.98 for each day worked so that when multiplied by four, as called for in the statute, we obtain an average weekly wage of $431.98. This results in an SEB calculation of $287.95 per week.

Plaintiff's Answer to the Appeal
Finally, Kahlden answered Horseshoe's appeal requesting additional attorney fees both for work performed in the original trial of this matter and for the work on appeal. Plaintiff argues that the award does not adequately compensate counsel for the *878 legal fees incurred in the prosecution of this matter. The WCJ was in the better position to make this determination. The trial court has wide discretion in assessing attorney's fees and its award will not be disturbed absent a showing of an abuse of discretion. Smith v. Tudor Const., 25,783 (La.App.2d Cir. 5/4/94), 637 So.2d 666. The record before us discloses no abuse of discretion by the trial court in fixing attorney's fees.
However, the plaintiff is entitled to an increase in the award to compensate for her attorney's work on this appeal. Accordingly, we award plaintiff an additional $1000 attorney fees to defend the appeal.
This court has previously decided the issue of when interest on attorney fees begins to accrue. See Williams v. Louisiana Indemnity Company, 26, 887-CA (La.App.2d Cir. 6/21/95) 658 So.2d 739. Hence, as explained in Williams, interest on the penalties and attorney fees awarded by the tribunal below and those awarded by this court begin to accrue from the date of judgment, respectively.

Conclusion
Accordingly, for the reasons stated hereinabove, we amend paragraphs "2" and "3" of the judgment of the worker's compensation office as follows:
IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:
* * * * * *
There be judgment herein in favor of the claimant, Vita J. Kahlden, and against Horseshoe Entertainment, the former employer of said claimant, awarding unto said claimant the sum of Two Thousand Two Hundred Twenty-Four and 21/100 ($2,224.21) Dollars, said amount being twothird's of the difference between the average weekly wage times ten weeks and the amount actually earned by the claimant for ten weeks. (Supplemental earning benefits based upon average weekly wage of $431.98 × 10 weeks = $4319.80$1130.29 = $3189.51 × 2/3's = $2224.21.) This amended award is subject to a credit for any amounts already paid due to the judgment below. Legal interest is due on the difference from December 31, 1995.
There be judgment herein in favor of the claimant, Vita J. Kahlden, and against Horseshoe Entertainment, the former employer of claimant, awarding unto said claimant supplemental earning benefits on and after January 1, 1996, payable by said Horseshoe Entertainment to Vita J. Kahlden weekly in the sum of Two Hundred Eighty-Seven and 95/100 ($287.95) Dollars per week with legal interest from the date due until paid.
In all other respects, the judgment below is affirmed. Appellant is cast for the cost of this appeal and additional attorney fees in the amount of $1000.00.
AMENDED, AND AS AMENDED, AFFIRMED.